IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 1:15CR223-1 |
| | : | |
| BENJAMIN CORNELIUS BLUE | : | |

---

<u>**DEFENDANT'S SEALED *FINAL* SENTENCING BRIEF**</u>

<u>**POSITION PAPER**</u>
<u>**REGARDING SENTENCING FACTORS AND ENHANCEMENTS**</u>

<u>**and**</u>

<u>**REQUEST FOR A DOWNWARD VARIANCE**</u>

<u>**and**</u>

<u>**REQUEST FOR A DOWNWARD DEPARTURE**</u>

---

## I.   <u>INTRODUCTION</u>

Defendant Benjamin Blue accepted responsibility for and plead guilty to the inexcusable offense of robbing a bank with firearm in hand. Indeed on May 9, 2015, all of the progress Ben Blue had made building a family and rebuilding his life in the two years since his release from prison, was undone. Ben's opiate addiction was renewed, having never received treatment for it, and he was trying to hide it from his family. He needed money to both support his addiction and to be able to keep his addiction hidden.

Following his release in 2013, Ben had met a woman, had a child with her, become a father to her two other children, gotten married, and had obtained a solid, though difficult job where he is said to be a hard worker by his boss and co-workers.  In that clouded mindset of an opiate addict, Ben made a terrible choice and reverted back to something forced on him at a very

1

young age by his older brothers, robbing a bank. As a result of a terrible decision that day, Ben deserves to be punished. There can be no question as to this and he understands and accepts this. However, because the Guidelines for his actions have been hijacked by the Career Offender Enhancement, this sentencing brief is submitted in hope that the Court will exercise compassion, empathy, equity, and considerations far beyond those apparently contemplated in the Career Offender Enhancement.

Benjamin Blue needs to be punished and he no doubt will be; he will receive substantial prison time for his actions. However, Benjamin Blue is not beyond fixing, not beyond being a productive member of society, not beyond being a great husband, and not beyond being an even better father. As his PSR and his character letters will reflect, Ben has shown the ability to be all of these things at times in his life so far. He needs substance abuse treatment and punishment. He is required to receive significant time just as a result of the statutory minimums at work in this case and the result his SRV case, never mind the Career Offender Enhancement.

The sentence being suggested by the guidelines is archaic and unnecessary. Defendant, by and through his counsel, respectfully requests that Your Honor exercise significant discretion in imposing a sentence and takes full advantage of the advisory nature of the guidelines.

## II.    FINAL POSITION REGARDING OBJECTIONS TO P.S.R.

Benjamin Blue ("Mr. Blue"), by and through his undersigned counsel, objects to being determined a "career offender" under the guidelines while also recognizing that the current authority in the Fourth Circuit appears to be against these positions. Nonetheless, defendant wishes to preserve his objections for purposes of any potential changes allowing future appeal or habeas relief.

Defendant's first eligible conviction would likely have been a juvenile offense in any state other than North Carolina. Defendant's second eligible conviction, 2113(a) Bank Robbery,

in which defendant had a painted, plastic toy gun, should not be considered a "crime of violence" under U.S.S.G 4B1.2(a)(1)'s "force clause."

**A. Using Defendant's North Carolina conviction from when he was 17-years old, in light of North Carolina's cruel and unusual policy to charge all 16 and 17-year olds as adults without any discretion, is a violation of Mr. Blue's constitutional protections provided by the 5th and 8th Amendments.**

Mr. Blue was convicted along with his older brother Frederick Blue of 4 counts Felony Robbery with a Dangerous Weapon in North Carolina. Mr. Blue was 17 years old at the time of this offense and states that his involvement was limited to being the driver for his older brother Frederick after being peer pressured into helping.

North Carolina is one of only two states to consider 16 year olds as adults, not juveniles, automatically and without discretion and one of only nine states to do the same for 17 year olds. In nearly every other state in the country, and indeed the 4th Circuit, these actions would very likely have earned Mr. Blue punishment in a juvenile court and thus prevented their use as a predicate offense for guideline purposes here today.

To treat Mr. Blue and those 17 year olds from North Carolina differently than those who had committed similar offenses at age 17 in any other State in the fourth circuit violates his Fifth Amendment Due Process protections and his protections afforded by the Eighth Amendment.

**B. 2113(a) Bank Robbery should not be considered a "crime of violence" under the "force clause" because the holdings of current precedential cases regarding robbery in the 4th Circuit are in conflict.**

Defendant recognizes that the Fourth Circuit recently ruled in its opinion in *United States v. McNeal*, 14-4871, (decided March 28, 2016), that 2113(a) Bank Robbery did fall under the "force clause" of the Armed Career Criminal Enhancement. The court in *McNeal* concluded that the "force clause" was applicable because under 2113(a), because the "by force and violence" element requires the use of "physical force" and similarly, the "by intimidation" element requires the "threatened use of physical force." However, the *McNeal* court appears to use the term

3

"physical force" to summarily declare the "force clause" applicable, without going into any detail as to what is required to constitute "physical force" under the "force clause" and whether 2113(a)'s intimidation element actually satisfies such. A petition for writ of certiorari was filed on June 28, 2016, number 16-5017, and is set to be reviewed at the September 26, 2016 conference.

Less than two months after the decision in *McNeal*, another panel of the Fourth Circuit decided the case of *United States v. Gardner*, No. 14-4533, slip op. at 18, 20 (decided May 18, 2016) and ruled that North Carolina common law robbery was not categorically violent offense and did not fall under the "force clause." The *Gardner* court held that North Carolina common law robbery could be accomplished by de minimis touching and thus did not rise to the level required by the "force clause" of "force capable of causing physical pain or injury to another." *Gardner* at 17. Thus, unlike the *McNeal* court, the *Gardner* opinion actually explores what "physical force" means under the "force clause" – "force capable of causing physical pain or injury."

In summary, the *McNeal* court concluded that 2113(a) Robbery, which requires the use of "force and violence, or by intimidation" does fall under the "force clause" while *Gardner* concludes that North Carolina common law robbery, which requires the use of "violence or fear" does not fall under the "force clause." These are almost identical elements but yet within two months the Fourth Circuit issues two opposed positions.

C. **There is at least some disagreement between the various Circuit courts about whether an element of "violence or intimidation" necessarily qualifies an offense under the "force clause."**

Beyond this internal conflict in the Fourth Circuit, Defendant believes there to also be a circuit split as to whether an offense involving "violence or intimidation" qualifies as a predicate offense for a "crime of violence" under the career offender guideline. The First Circuit just last

4

year held that the offense of "*use of violence or intimidation* against public officials" did not qualify as a predicate crime of violence. *U.S. v. Ramos-Gonzalez,* No. 12-1711 (1st Cir. Jan. 6, 2015).

In *Ramos-Gonzalez*, the defendant was initially found to be a career offender under U.S.S.G. § 4B1.2(a) based on two prior convictions – a 1987 conviction for "use of violence or intimidation against a public official or employee" and a 1991 conviction for first-degree murder. On appeal, Ramos-Gonzalez challenged the use of his 1987 conviction as a predicate offense to make him a career offender alleging that this offense was categorically ineligible for use as a predicate offense because "intimidation" does not necessarily include an element related to *physical force against an individual. See Ramos-Gonzalez* at *44. The First Circuit agreed with Mr. Ramos-Gonzalez and found that this prior offense did not qualify as a predicate offense, whether under a categorical or modified categorical approach. *Id.* at 48.

Based on these grounds – notwithstanding the Fourth Circuit's opinion in *McNeal* – the defendant objects to the use of a 2113(a) conviction as a predicate offense for finding him as a career offender under the sentencing guidelines.

## III. Defendant's Request for a Downward Variance Based on 18 U.S.C. § 3553 Factors
### a. History and Character of the Defendant – 18 U.S.C. § 3553(a)(1)

Benjamin Cornelius Blue is a 31 year old male from High Point, North Carolina. He has 11 siblings, eight of which are brothers. Mr. Blue is the fourth youngest of the 9 brothers. Four (4) of Mr. Blue's five older brothers have been convicted of some sort of armed robbery offense. Mr. Blue was unduly influenced by his older brothers' actions in his youth, which set the stage for the actions underlying Defendant's Blue's current appearance in front of the Court.

Also of interest, Mr. Blue suffers from an opiate, prescription pain pill addiction. This addiction played a significant role in Mr. Blue's awful decision to commit the underlying

robbery. The spells of addiction often cloud judgment and make bad decisions seem necessary. Mr. Blue would likely benefit much more from extensive substance abuse treatment and rehabilitation than the substantial additional time he is subjected to under the archaic career offender guideline.

Additionally, Mr. Blue has the support of his wife, their friends in the community and co-workers. Attached to this Sentencing Brief as Exhibit A are 13 character letters, their authors are as follows:

1. Tony Harris, childhood friend
2. Aaron Wilson, co-worked and close friend
3. Loretta Bryant, mother-in-law
4. Steven Boyles, step-father-in-law
5. Burley Stevens, manager/co-worker and friend
6. Reannon Blue, wife
7. Michael Massengill, co-worker and friend
8. Audra Massengill, friend
9. Jason Cook, co-worker
10. Stacy Gerrard, friend
11. David Yoder, co-worker and friend
12. Andy Gladney, childhood friend
13. Steven White, childhood friend

**b.     Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct – 18 U.S.C. § 3553(a)(2)**

Mr. Blue faces a lengthy prison term even at the permissible minimums because he faces a 7-year (84-months) statutory minimum on the instant firearm offense and another year or two is mandatory for his supervised release violation. But for his being made a career offender, his "Total Offense Level" would be a 19 at a "Criminal History Category" V rather than his current Total Offense Level of a 31 and Criminal History Category VI.

Without the archaic career offender guideline, <u>Mr. Blue's guideline range would be 57-71 months</u> for the armed bank robbery; below even the 7-year/84 months statutory minimum for the firearm conviction. The archaic career offender guideline calls for a prison sentence in the range

6

of 272 months to 319 months. Such a lengthy prison term is way significantly more than needed for any deterrent effect.

"Research to date generally indicates that increases in *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits." Valerie Wright, "Deterrence in Criminal Justice | Evaluating Certainty Versus Severity of Punishment," The Sentencing Project, November 2010 (available at: http://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf). "[W]hen prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism." *Id.* at p. 7.

"Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive." *Id.* at p. 9.

A combined prison sentence in the area of 10 years is sufficient but not greater than necessary to accomplish the ends of justice and will maximize the need for deterrence while at the same time allowing the defendant a light at the end of the tunnel and the ability to help raise his son upon his release. Further, extensive drug rehabilitation during that time along with the learning of vocational skill traits and further education are much more likely to benefit defendant and society than imprisoning him for 20+ years.

### c. The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)

Under *Booker,* the Court has great ability to craft a sentence which will both appropriately punish the defendant but also seek to rehabilitate and help the defendant so that upon his inevitable release, he is best suited to re-enter society as a stable, contributing member.

7

### d. Need to Avoid Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(6)

Mr. Blue's co-defendant in this matter was Austin Randy Owens. Mr. Owens was sentenced by Chief Judge William Osteen, Jr. on January 12, 2016. Judge Osteen sentenced Mr. Owens to 63 months imprisonment followed by 4 months supervised release. (Docket Entry 41.)

## IV. Defendant's Request for a Downward Variance Based on the Unreasonableness of U.S.S.G. § 4B1.1.

Even with properly calculated guidelines, a guidelines' sentence may not be presumed reasonable for any particular defendant. *See United States v. Dorvee*, 604 F.3d 84 (2d Cir. 2010), citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). In *Dorvee*, Judge Parker stressed that "it is emphatically clear that the guidelines are guidelines – that is, they are truly advisory." *Dorvee*, 604 F.3d at 93 (internal quotations omitted).

### a. The sentences suggested by 4B1.1 are inherently unreasonable

The archaic length of the sentences and lack of distinction between offenders under 4B1.1 is not based on any empirical evidence or experience, but is instead the result of politics, not data, and goes against the growing consensus that such archaic sentences and sentencing enhancements are counterproductive, expensive, and unnecessary.

### b. The two predicate convictions, although apparently applicable, are both questionable.

Rather than restate arguments already made, Mr. Blue would simply rest on his prior above argument that the use of his juvenile conviction as the first predicate offense to make him a career offender, because he is from North Carolina – which is the only State in the circuit which considers 16- and 17-year olds adults and one of only two states nationally – is unconstitutional. In most other States, there is a real chance that Mr. Blue would have remained under juvenile jurisdiction especially in light of the influence on him by his older brother in the offenses.

8

Further, Mr. Blue also reiterates that there seem to be splits both within the 4th Circuit and more broadly between the circuits as to whether his 2009 conviction should qualify under the "force clause" for the career offender guideline. This is an issue which will likely have to be resolved by the Supreme Court at some point in the near future. Until that time, despite the Fourth Circuit's ruling in *McNeal*, Mr. Blue requests the Court's elect not to use such offenses to apply the career offender enhancement or to downward vary so as to nullify the enhancement.

### c. The seriousness of the offense and Mr. Blue's prior convictions are already properly accounted for under the guidelines.

Mr. Blue finds himself facing this archaic enhancement largely in part because of his prior conviction for 2113(a) Bank Robbery when he used a painted, toy gun. Although this offense is certainly relevant to Mr. Blue's sentencing in the instant offense, it is indeed already accounted for in two ways, without need for an additional enhancement under the archaic career offender guideline. First, Mr. Blue was on supervised release for the offense and is already subject to a supervised release violation got which he must receive mandatory prison time. Second, the offense is accounted for twice in determining his "Criminal History Category" – 3 points for the offense itself and further 2 point increase pursuant to U.S.S.G. § 4A1.1(d) because he was on supervised release.

Further, the offense of 2113(d) Armed Bank Robbery is no doubt serious, but that seriousness is already accounted for in the base offense level and specific offense characteristic as set out in the 2B3.1 guideline.

Accounting for the seriousness of an offense is the reason the Sentencing Table already assigns different offense levels in order to punish what society views as a worse offense more harshly. Similarly, those with worse criminal records should receive harsher sentences and thus the Sentencing Table accounts for those worse criminal records by increasing sentences for more

severe criminal history categories. Arbitrarily taking some offenders off of the Sentencing Table and arbitrarily maximizing their criminal history categories <u>and</u> summarily ratcheting their offense levels to archaic levels seems inherently unreasonable.

Due to this unreasonableness and the fact that the guidelines already account for criminal history categories and seriousness of offenses, Mr. Blue respectfully requests that this honorable court downward vary entirely from the career offender guideline so as to nullify this archaic enhancement. Such a variance would help ensure a sentence which is sufficient but not greater than necessary.

## V. <u>Defendant's Request for a Downward Departure</u>

It was the defendant's hope that the Government would be filing a 5K1.1 motion in this matter due to Mr. Blue's extensive attempts at cooperation with the United States as well as with the states of North Carolina and South Carolina on numerous defendants on numerous occasions. Unfortunately, despite Mr. Blue's extensive attempts, none resulted in his having the opportunity to testify, as of yet.

In support Mr. Blue's extensive efforts, attached in Appendix B is a letter to AUSA Pousson dated April 1, 2016, detailing much of Mr. Blue's work.

Beyond the information contained in this letter, Mr. Blue provided extensive information to the solicitor's office in Horry County, South Carolina. Solicitor Chris Helms and undersigned counsel had numerous, extensive conversations and Solicitor Helms has made it clear that he would like Mr. Blue to testify in an attempted murder case of an defendant named Cornelius Woods whom they had on video shooting an individual. (Mr. Woods was recently sentenced by this very Court for violating his supervised release in relation, at least in part, to this very conduct in South Carolina.) Mr. Blue was able to provide Solicitor Helms with information he

already knew to be true from other videos from the hotel which had not been made public and thus were independently learned by Mr. Blue.

However, in a very unfortunate turn of events, the victim in this case is refusing to cooperate with the solicitor's office in Horry County and that office is currently unsure they will be able to proceed with the case. If they are able to proceed against Cornelius Woods, they very much would still like Mr. Blue to testify.

U.S.S.G. 5K1.1 contemplates a downward departure for defendants who have "provided substantial assistance in the *investigation or prosecution* of another person who has committed an offense." However, for some reason the Sentencing Commission has given the Government the sole authority to initiate this motion and not clearly set out parameters as to when the Government must initiate such a motion. It is unfortunate that the Government seems unwilling to initiate such a motion in this case despite Mr. Blue's extensive and good-faith attempts. If no 5K1.1 departure is received, Mr. Blue respectfully requests that the Court consider these efforts elsewhere through possible variances.

<u>Conclusion</u>

For the foregoing reasons, Defendant Benjamin Blue respectfully requests that the Court downward vary to discredit the Career Offender guideline to a sentence which is "sufficient but not greater than necessary to achieve justice in this matter and then further downward depart based on 5K1.1.

Respectfully submitted this 5th day of August, 2016.

/s/ Daniel A. Harris_____
Daniel A. Harris
NCSB No. 46086

/s/ Andrew C. Clifford _____
Andrew C. Clifford
NCSB No. 32623

11

/s/ Locke T. Clifford
Locke T. Clifford
NCSB No. 846
*Counsel for Benjamin Blue*

OF COUNSEL:
Clifford Clendenin & O'Hale, LLP
415 W. Friendly Avenue
Greensboro, NC  27401
Phone: 336-378-1212
Fax: 336-333-9820
Email: daniel@cliffordlawoffice.com
Email: andrew@cliffordlawoffice.com
Email: locke@cliffordlawoffice.com

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the

Court using the CM/ECF system which will send notification of this filing to the following:

AUSA Kyle Pousson.

Respectfully submitted this 5th day of August, 2016.

/s/ Daniel A. Harris
Daniel A. Harris
NCSB No. 46086
*Counsel for Benjamin Blue*

OF COUNSEL:
Clifford Clendenin & O'Hale, LLP
415 W. Friendly Avenue
Greensboro, NC  27401
Phone: 336-378-1212
Fax: 336-333-9820
Email: daniel@cliffordlawoffice.com

# Appendix A

(Character Letters)

March 03, 2016

To whom it may concern,

I have known Ben for almost 20 years, we went to middle school together as well as high school. Ben was always a good friend. He would give the shirt off of his back if he needed to. He was always influenced by his older brothers and pressured a lot to walk in their path. If you have only been around a specific way of life, and it does not help when his brothers are also known for similar things. Ben was always kind to his family and friends. He was quiet and did not have a lot growing up. He comes from a very large family and their resources were limited. But I can say he was always appreciative and well behaved. He was also very kind to all of the elderly in our neighborhood where we grew up.

Thank you

Tony Harris



336-989-7104

DEFENDANT'S
EXHIBIT
1
tabbies

April 30, 2016

To whom it may concern.

On behalf of Benjamin Blue, I would like to describe his character I don't know if he felt the same but I see Ben as my brother and best friend. We worked together for 2 years and without him at work it is just not the same. I and this man have never even had words that were anything less than friendly and calm. He has a great work ethic and knows how to be a team player for the company. When he comes into work, he gives his all the entire time he is there. He was good at leaving his personal business at the door unless there was an appropriate time and if was odd to see him mad or unpleasant. His family was all he ever talked about and he loves his children so much. During the entire time we worked together he may have missed work 3 days and 2 of those days were due to the birth of his first child. Although, he looks bad in the eyes of the court, personally he has a good heart and is a good guy.

Aaron Wilson

AARON Wilson

336-255-9812



February 20, 2016

Dear Federal Court,

Hello my name is Loretta Bryant, in relation to Benjamin Blue, he is married to my daughter, Reannon Blue. In reference to his character, Ben was always very nice and respectful. If there is any time that my daughter, Reannon, and I did not see eye to eye, he never would get involved. He is also the best father to my grandchildren. Since Ben and my Reannon have been together, they were doing very well. He has always worked and held down a job, maintained a nice vehicle, and paid the bills. My daughter and he shared the responsibilities with taking care of the children and keeping their home in order. I do believe that Ben, if given another chance could still be productive to society. Personally I don't support the crime that he was involved in and I am not happy about the choices made, however I can say that he is sincerely regretful and that he would move mountains to turn back the hands of time. The difference between the past and now is, he never had a lot to lose before. Today Ben understands the importance of his presence in his household. I can see that Ben is very sincere about this and that he really does care for his children and wife. He has always been kind and easy to speak to. He was there for Reannon through her entire pregnancy and also tried to do the right thing by marrying her after their first child together was born. Ben is the type of guy who is generally very likeable and friendly. He has a heart of gold, although he has made some bad choices, we still want to believe in him and try to give him the support he needs. We understand that Ben is going to have a prison sentence however I would like to beg the court to have mercy on him on the day of sentencing. He has no intentions of wanting to just get off scot free, however we are simply asking the court to consider sentencing well below the guidelines of a carrier offender. Ben's boss, from the job he was working, is still willing to offer him employment even after they are aware of his charges. That in itself speaks volumes on his character. Really there is no winner in this situation, my daughter is now raising 3 kids on her own, and financially picking up the void left by Ben's incarceration. This has been hard on all of us and we understand there are consequences to every action. Please consider his family during this hard time. He will have the support and help needed to get through this.

Sincerely

Loretta Bryant

336-847-7009



DEFENDANT'S
EXHIBIT
3

To Whom It May Concern,

     If this letter is being read, then I am aware that this is not a good day for Benjamin Blue. I have been asked to write a letter describing his character and why I would describe him as so. First of all I want to introduce myself. My name is Steven Q Boyles. I am his wife's step father. I have been with Loretta, Reannon's mother for over 25 years now and we are legally married. About 2 years ago I had several massive strokes. I lost most of my balance, ability to stand up and walk, as well as controlling my muscles for purposes to use the bathroom. My hand is much damaged so I am unable to type or write. This letter is being typed by my wife as I tell her what to write. Ever since I had the debilitating strokes my son-in-law has been nothing but helpful. Before this incident, he would come to our home daily or at least every other day. He would always call before he came to make sure my wife and I have what we need. Neither of us are able to drive at this point, so having supportive helpful people like my daughter and son-in-law is very helpful. He has given us money on numerous occasions never asking for it back. He helps my wife to pick me up in order to go to the restroom or to be able to move. I have always liked Ben because of his friendly and caring personality. He has always respected my wife and I and has helped us in so many ways. Reannon and Ben's children are crazy about their father and will tell you at any given moment that they love him with all of their heart. Without Ben around I would have not been able to do a lot of things. He is very well mannered, outgoing, and respectful to his mother and family. Please consider this during sentencing.

                                                                        Thank you kindly

                                                                       Steven Q. Boyles



Dear Judge,

My name is Burley Stevens, I am a Lead General Foreman from Asplundh Tree Service. I hired him on in August 2014. The job we do is hard work. The physical side of it is exhausting and very tiring. A longtime friend of Benjamin's recommended him for the job. He asked me to trust him and said he was a good man. I quickly realized on my own what kind of worker he was. He was always at work on time. He rarely ever missed a day. Including driving to work in the snow. The road conditions were very icy and dangerous. However he did not let that stop him. Ben is like a brother to me. He would put his all into every single day of work. I can honestly say that if Ben were able to come back to work, i would seek approval from our district location to overlook his background and still employ him. You can't find too many employees like Ben. He was also always around his family and talked about his wife all the time. Lastly it was obvious that Ben loved his kids. He would constantly talk about them.

Burley Stevens

General Foreman Asplundh Tree Company

336-362-7388



Hello, my name is Reannon Blue, I am married to Benjamin Blue. I wanted to take a moment to write about his character as a husband and father. Ben does have his issues with life and I can assure you I do not support or agree with them. However, he is a good man. I can say I have never found any evidence of cheating, lying. He has always been faithful to me and right beside me all the time. Even when he had the opportunity to get out of the house, he would still choose to be with me. He is my first true love and my husband. Although I am very unhappy with what is happening, you cannot stop your heart from loving. He was honest with me from the beginning, by letting me know his past. And he was a great father to my children as well. When I first met Ben, I had fallen and broke my ankle in 3 places. I had to be taken to the hospital in an ambulance. After arriving I learned that I needed immediate surgery. The hospital was not able to find a surgeon on call so they sent me home and I had to find a surgeon on my own. This was a very hard time in my life and I was in a serious struggle just to be able to take care of my kids. I had to get 11 pieces of hardware placed into my ankle. I also had to go through years of physical therapy and my knee is now bad due to the injury. However, when Ben stepped in, he helped me so much. He cooked, help me to bathe the children, kept the house spotless as well as worked a full time job. Ben is truly one of the hardest working man that I have ever met. I understand that Ben will have to pay for what he illegally did, however, we are asking for the court to give him as much leeway as possible. So because Ben took care of me for all this time, there is no way that I could leave him. It is not every day that a man would want to be with a woman with 2 other kids. And when we first met, I did explain that I was looking for a long term relationship and possibly marriage. I vowed to never have another child out of wedlock. When I became pregnant with our youngest son, who is 1. He asked me to marry him. I am not asking the court to not recognize what has happened, I am only asking that they keep these characteristics in mind.

Sincerely

Reannon Blue

336-847-7009



April 12, 2016

To Whom It May Concern,

      Benjamin Blue and I worked together at a furniture plant in Asheboro, NC. We worked beside each other for 3 years. Ben ended up getting a better job. But we still stayed in contact on a regular basis. I considered him as my brother and best friend. My wife, Audra, and I used to come to Ben's house for dinner. Ben and his wife loves one another and always provided a nice and clean environment for his children. He was always loving towards his wife and a great father to his kids. Ben was the kind of guy who would give his last to help another.

Michael Massengill

336-906-2534



Dear Federal Court,

I am the wife of Michael Massengill. I initially met Benjamin Blue and his wife, Reannon through my husband around 2 years ago. I have been over to their home several times. We have had a lot of cook outs and family get together. We also went to dinner together, as double dates, on Valentine's Day 2016. I noticed Ben to always be loving towards his wife. He would do anything to see her happy. He was always there for his children and loved them so much. His step daughter worshiped the ground he walks on. She is inseparable with Ben. And it is very clear to see that he is the same for her. Ben was always nice and respectful to everyone around him. I have never met anyone personally who does not like him.

Sincerely,

Audra Massengill

336-823-0075

*Audra Massengill*



DEFENDANT'S
EXHIBIT
8
tabbies

Hello, I worked with Ben at Asplundth Tree Company, it was our job to pick up the bigger tree limbs off of the ground while the bucket man cut the limbs down. Ben was always positive and upbeat. When things seem bad, you could talk to Ben and he had a way of making problems seem small and not worth worry about. I know on this day he is not taking his sentence lightly. I know how much his kids and wife mean to him and he knows they are suffering because of his choice. Ben is well mannered and speaks kindly to people. He is one of the most hardworking man I know. Please consider his wife and children and know they need him. And are continuing to pray for Ben that he gets the help that he needs.

Jason Cook

*Jason Cook*

336-233-3656

**DEFENDANT'S EXHIBIT**

tabbies

1

Hello, I met Ben while previously incarcerated with him. We were roommates in prison. He is like a son to me. He was always positive and a good person to be around. He was also a very clean and meticulous person. He always kept his surroundings clean and his clothes neat. Even though we were in jail, he still took pride in his appearance and living quarters. It has been said that a clean and neat person is a Godly person. Ben was also very easy to get along with. At all cost he would do anything to save conflict or violence. He also is willing to stand up for what he believes. Out of the 5 years we did in prison together, I never once seen him have any type of disagreement with any person. This is a big accomplishment when being locked up. He always knew how to keep to himself and to stay in his own lane.

Thanks

Stacy Gerrard

336-987-3456



I know Ben from work, he worked at Asplundh Tree Company. He is like a brother to me and we miss him. I can't say anything bad about him. He is very hard working and always does the job right the first time. I always thought a lot of him because he was never involved with gossip and talking about people. When somebody came to him with conflict he always was able to defuse it fast. Ben is usually always smiling and happy.  He always talked about his wife and how proud he was of her. There was never a day that he was not telling us about her and how glad he is to have her. I could tell they love each other.

David Yoder

*David Yoder*

704-523-3621



DEFENDANT'S
EXHIBIT
11

I am writing this on behalf of Benjamin Blue's character as a person. I have known Ben for around 20 years. We used to catch the school bus together and laugh and joke in the back of the bus. I always considered Ben to be my best friend. I know this must difficult on his wife and kids. As much as Ben loved his kids and wife there is no question in my mind that he is feeling guilty and responsible. Ben was always very respectful. My condolences go out to his family and children.

Andy Gladney

336-992-3223



DEFENDANT'S
EXHIBIT
12

To whom it may concern,

I have been a friend of Ben since childhood. I lived down the street from him when we were kids. We used to hang around each other every day after school and also during the summer time. My parents knew Ben as their son not just a neighbor. Throughout my whole life Ben has been a good friend. His wife, Reannon, who had children with other men, but Ben did not care, he actually because so close to their middle daughter that still to this day she does not know that Ben is not her biological father. He came into her life at a young age. And has been there ever since the first day that he came into his wife's life. They are always so happy together and it is easy to see that their love is deep.

Steven White

336-689-3201



# Appendix B

(April 2016 Letter to AUSA)

# CLIFFORD CLENDENIN & O'HALE, LLP
## CLIFFORD DIVISION
415 WEST FRIENDLY AVENUE
GREENSBORO, NORTH CAROLINA 27401
Email: daniel@cliffordlawoffice.com
www.ccolawyers.com
Federal Tax I.D. #56-1042434

LOCKE T. CLIFFORD
ANDREW C. CLIFFORD
DANIEL A. HARRIS

TELEPHONE
(336) 378-1212
FACSIMILE
(336) 346-3292

April 1, 2016

AUSA Kyle Pousson
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401

 RE: CONFIDENTIAL - Request for 5K1.1 Motion for Benjamin Blue in
 15CR223-1

Kyle:

 As we have been discussing for months, I am very much hoping that you will give
Mr. Blue some form of a 5K1.1 motion before his sentencing in two months on May 17.
In support of this, I have compiled a list of all the individuals Mr. Blue has <u>attempted</u> to
provide information against to various law enforcement agencies in both North and South
Carolina, state and federal.

1. **Jonathan Blue &**
2. **Joseph Blue**

   Benjamin Blue met with detectives on two separate occasions to discuss several unsolved bank robberies which Benjamin knew to have been committed by his older brothers, Jon and Joe Blue.

   First, on July 9, 2015 - Benjamin Blue met with Detective Ward of the Guilford County Sheriff's Department as well as Detective Ferrell of the Greensboro Police Department. Benjamin Blue provided Detectives with information regarding three unsolved bank robberies committed by his brothers in 2004-05 – including which banks, who assisted his brothers, the type of gun used, the vehicle's which would have been driven, his brothers' MO when selecting banks and robbing them, and information about other individuals who may also have more information and where they could be found.

   Second, on December 29, 2015 – Benjamin Blue met with Detective Miller of the Guilford County Sheriff's Department and also a FBI Task Force member. Benjamin Blue once again provided what information he knew about three prior bank robberies committed by his older brothers Jon and Joe. This information included information about

   Following this meeting Detective Miller was able to much confirm the information provided by Benjamin Blue as to one or two of the robberies based on police investigation reports from the robberies. It turns out that Jon and Joe were indeed the suspects and police had even discovered a dye-stained bill in the vending machine where Joe worked. For whatever reason though, law enforcement and prosecutors decided originally not to go after Joe and Jon for these offenses and because of this, Detective Miller did not believe he would not be able to convince them to re-open the case. Nonetheless, Defendant Benjamin Blue provided substantial information, much of which appears to have been corroborated by independent police investigation as having been truthful.

3. **Elias Blue**

   Benjamin Blue, during his meeting with Detective Miller on December 29, 2015, also provided information regarding an unsolved armed robbery of a Food Lion grocery store from 2003 in High Point off Scientific Drive. Benjamin informed Detective Miller that this store was robbed by his brother Elias Blue who was driven by his brother Joseph Blue using a 1983 Green Oldsmobile Cutlass, belonging to Fred Blue. Benjamin informed Det. Miller that Elias wore a black mask, walked in from the side entrance and once inside, he shot off the gun in the air one time, which was the first time Elias had ever shot his gun as a part of a robbery. Benjamin told Miller that police got there more quickly than anticipated and although they had set up a perimeter in the area, they did not check the woods behind the store which is where Elias hid for a few hours and where he left his gun. After the police cleared out, Elias spotted Joseph driving around the area and jumped in the car together. Benjamin learned about this robbery directly from Elias following Benjamin's release from prison in 2006.

## 4. Cornelius Woods

Perhaps the most ruthless and vicious individual Benjamin Blue tried to gain information on for law enforcement was Cornelius "Corn" Woods. Mr. Blue put himself in great danger by befriending Mr. Woods and trying to learn details of his cases, particularly because Mr. Woods is involved in gang activity and is known to be an especially brutal individual. At the time, Mr. Woods was wanted on attempted murder charges in both High Point, NC and Myrtle Beach, SC

Mr. Blue reached out to both the Detectives in Myrtle Beach and their District Attorney's office, however, despite numerous letters, calls by his wife, and calls by his attorney's we could not get them to respond and use Mr. Blue's information. In that case, Corn was accused of shooting another gang member in a hotel room who he was having a dispute over the sale of narcotics with. The hotel video in that case showed Corn fleeing the hotel room but did not show the actual shooting itself. The individual Corn shot was also a gang member and refusing to testify against Corn for fear of being labeled a snitch by his gang; he was also being threatened by Corn's friend in the jail and fellow blood member, Henry Smith. Further Corn was planning to take the case to trial because there was no video, no firearm recovered no gunshot residue evidence, etc. However, Corn had directly confessed to this shooting to Mr. Blue who was informed that Corn went down to Myrtle Beach just to get this guy and he used a close female friend to bait the victim into the hotel room where he was actually shot. He gave his gun to the female friend after the shooting to dispose of it. Mr. Blue had further information regarding this incident directly from Mr. Woods, however this was the bulk of it.

Corn was also on Federal Supervised Release for a conviction in this the Middle District of North Carolina and was subsequently revoked by the Honorable James A. Beaty, Jr., sentenced to 60 months in prison, and upheld by the Fourth Circuit in an unpublished opinion decided January 19, 2016 (Appellate No. 15-4285). At the revocation hearing, the Government was represented by AUSA Eric Iverson who was able to get at least some witnesses to the shooting to testify against Corn and their recount of the event appears to line up squarely with the information provided to SC authorities by Mr. Blue.

Corn was also wanted on an attempted murder out of High Point stemming from a club shooting. However, Mr. Blue did not have anything valuable to add in this case and when we reached out to the High Point DA's office to see if there was anything they wanted Blue to try and obtain, they informed us that the main witness in the case refused to cooperate and therefore they could not prove their case and it was dismissed.

## 5. William Donnell Hill

Benjamin Blue attempted to provide information regarding Mr. Hill however based on my discussions with AUSA Pousson, I did not believe this was a case the United States Attorney's Office would care about because Mr. Hill was charged with shooting a firearm in the city, firearm by a felon, and assault with a deadly weapon. Based on our discussions, I did not believe this case likely to be of a serious enough nature to assist Mr. Benjamin Blue in procuring a 5K1 motion and we therefore did not pursue this matter further with the Forsyth County District Attorney's Office. However, that was not due to a lack of effort on the

part of Mr. Blue to try to gain information to assist the Government in prosecuting Mr. Hill for an attempted shooting. During their conversations, Mr. Blue learned that Mr. Hill had was intending to defend the case because the gun police found was over a mile away (he had tossed it) and he had first wiped it clear so there were no fingerprints nor other way to tie him to the weapon and further, they only video in the case did not show the assailants face. Mr. Blue was willing to assist authorities in this case, but for his attorney's intervention.

6. **Timmy Taborn**

Benjamin Blue has reached out to AUSA Frank Chut through the form of a written letter to provide Mr. Chut with information regarding Mr. Taborn, who is in the process of trying to withdraw his plea and go to trial. Mr. Blue has befriended Mr. Taborn in the Alamance County Jail and is willing and able to gather information from Mr. Taborn to help the Government. Particularly, Mr. Blue has already gathered what the focus of Mr. Taborn's defense will be and learned and seen that Mr. Taborn has receipts from his transactions at a pawn shop which directly contradict and impeach the owner of the pawn shop who will likely have to be called as a Government's witness if the case goes to trial. Beyond this Mr. Blue is aware of other areas Mr. Taborn would intend to attack at trial and is happy to share these or attempt to gather more information at the Government's instruction.

Sincerely,

*Daniel A. Harris*

Daniel A. Harris